IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| ELLIS REFINANCE PORTFOLIO, LLC,<br><br>　　Plaintiff,<br><br>v.<br><br>NEWREZ, LLC d/b/a SHELLPOINT MORTGAGE SERVICING and CORELOGIC SOLUTIONS, LLC (CA) d/b/a CoreLogic,<br><br>　　Defendants. | Civil Action No.<br>1:23-cv-01954-VMC |

**OPINION AND ORDER**

Before the Court is Defendant CoreLogic Solutions, LLC's ("CoreLogic") Motion to Dismiss, or, in the Alternative, Motion to Substitute Parties Due to Misjoinder ("Motion," Doc. 4). For the reasons that follow, the Court will grant the Motion.

**Background[1]**

On October 11, 2019, Ellis Refinance Portfolio, LLC ("Ellis") obtained a loan from 5 Arch Funding Corp. in the amount of $14,148,750.00, identified as loan number 0670671494 (the "Loan") (Doc. 2 ¶ 6). The Loan is secured by 144 single-

---

[1] Because this case is before the Court on a Motion to Dismiss, the following facts are drawn from Plaintiff's Complaint and are accepted as true. *Cooper v. Pate*, 378 U.S. 546, 546 (1964).

family residential properties owned by Ellis and located in the State of Georgia. (*Id.* ¶ 7). Of the properties securing the loan, one is located in Henry County, one is located in Clayton County, and 142 are located in DeKalb County. (*Id.* ¶ 8). The Loan is currently serviced by Shellpoint, pursuant to a contract between Shellpoint and the current holder of the Loan, U.S. Bank, National Association (the "Holder"). (*Id.* ¶ 9). Shellpoint is paid for its servicing activities by taking a portion of each monthly payment tendered by Ellis on the Loan. (*Id.* ¶ 10).

As part of its servicing obligations, Shellpoint collects Ellis's monthly payments on the Loan and diverts a portion of such payments into an escrow account for the payment of real property taxes for the properties securing the Loan. (*Id.* ¶ 11). Shellpoint manages this escrow account for the benefit of Ellis, and Shellpoint is responsible for ensuring payments from the escrow account are promptly and properly tendered to the appropriate tax commissioner for the protection of the Properties. (*Id.* ¶ 12). Shellpoint contracted with CoreLogic for CoreLogic to handle and oversee the proper and timely payment of real property taxes for the properties secured by loans serviced by Shellpoint. (*Id.* ¶ 13). As a result, beginning on or about March 2, 2021, CoreLogic assumed responsibilities for handling and overseeing the proper and timely payment of real property taxes for the properties secured by the Loan. (*Id.* ¶ 14).

For the 142 properties securing the Loan which are located in DeKalb County, the first installment of the DeKalb County property tax obligation for tax year 2021 was due on September 23, 2021, and the second installment was due on November 15, 2021. (*Id.* ¶ 15). For 137 of those properties, CoreLogic and/or Shellpoint made the first installment payment of property taxes to DeKalb County, but failed to make the second installment payment of property taxes on or before November 15, 2021 (collectively, the "Subject Properties"). (*Id.* ¶ 16). In December of 2021, Ellis informed Shellpoint that the property tax obligations for the Subject Properties had not been properly made by Shellpoint, and that the property taxes were now delinquent for the Subject Properties. (*Id.* ¶ 17). In response, Shellpoint advised on January 4, 2022 that it had "opened the request to have it reviewed and paid asap." (*Id.* ¶ 18). After follow-up communications from Ellis, Shellpoint responded on January 7, 2022 by stating "[t]his was sent to management to expedite as of now we have an estimated time to be completed by 01/18/2022." (*Id.* ¶ 19). Ellis had countless email and telephone communications with Shellpoint in the months that followed in a good faith effort to get Shellpoint to honor its obligations and pay the property taxes. (*Id.* ¶ 20). In these communications, Shellpoint often apologized for the delay in paying the taxes and offered assurances that the issue was being reviewed or escalated, and that it would be corrected. (*Id.* ¶ 21). On February 28, 2022, Shellpoint sent an email to Ellis which

listed 35 of the Subject Properties and stated that "Taxes are paid current" for each. (*Id.* ¶ 22). Shellpoint's statement that the "Taxes are paid current" was false, as the listed Subject Properties still had unpaid balances for the second property tax payment. (*Id.* ¶ 23). On May 3, 2022 Shellpoint sent an email to Ellis which again stated, "Taxes are paid." (*Id.* ¶ 24). Shellpoint's statement that the "Taxes are paid" was again false, as the listed Subject Properties still had unpaid balances for the second property tax payment. (*Id.* ¶ 25).

Despite numerous communications and warnings from Ellis to Shellpoint regarding the unpaid property taxes, CoreLogic and/or Shellpoint failed to fully pay the property taxes for the Subject Properties, resulting in tens of thousands of dollars in interest and fees accruing on top of the outstanding property tax amounts. (*Id.* ¶ 26). On May 13, 2021, the Subject Properties were levied upon due to the unpaid property taxes, and the Subject Properties were scheduled to be auctioned by the DeKalb County Sheriff on the steps of the DeKalb County Courthouse on July 5, 2022. (*Id.* ¶ 27). Ellis advised Shellpoint that its failure to fully pay the property taxes for the Subject Properties had resulted in the levies and the scheduling of the tax sales for July, but Shellpoint continued to refuse to take substantive action to resolve the issue and pay the unpaid tax balances. (*Id.* ¶ 28). Notices regarding the tax sales were sent by DeKalb County directly to the Subject Properties, leading to inquiries from Ellis's tenants and concerns about

4

future ownership changes for the Subject Properties. (*Id.* ¶ 29). Ellis was also inundated by calls and messages from wholesale real estate purchasers and investors who learned of the scheduled tax sales and believed the ownership of the Subject Properties might be distressed and that Ellis might be inclined to sell. (*Id.* ¶ 30). Ellis and its representatives were also contacted by representatives of DeKalb County to discuss the significant balance of unpaid taxes and the scheduled tax sale. (*Id.* ¶ 31). Ultimately, Ellis directly paid $70,653.53 to DeKalb County on June 22, 2022 to avoid having the Subject Properties sold at the impending tax sales. (*Id.* ¶ 32).

## Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). For the purposes of a motion to dismiss, the court must accept all factual allegations in the complaint as true; however, the court is not bound to accept as true a legal conclusion couched as a factual allegation. *Twombly*, 550 U.S. at 555. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 679. Although the plaintiff is not required to provide "detailed factual allegations" to survive dismissal, "threadbare recitals of the elements of a cause of

action, supported by mere conclusory statements, do not suffice." *Id.* at 678; *Twombly*, 550 U.S. at 555.

## Discussion

### I. Motion to Substitute Granted

In the alternative to its request for dismissal, CoreLogic requests that this Court substitute CoreLogic with CoreLogic Tax Services, LLC ("CoreLogic Tax"). (Doc. 4-1). Ellis consented to this alternative request (Doc. 10), which the Court will grant so that the relief in this Order runs to the proper party. However, for clarity and ease of reference, the Court will not distinguish between CoreLogic and CoreLogic Tax in this Order.

### II. Motion to Dismiss

Ellis raises one independent claim against CoreLogic for negligence, plus two derivative claims for punitive damages and attorney's fees. With respect to negligence, Ellis alleges that

> By accepting responsibilities and obligations for handling and overseeing the payment of real property taxes for the Subject Properties, CoreLogic assumed a duty to promptly and properly make such property tax payments. . . . In failing to make the property tax payments promptly and properly for the Subject Properties, CoreLogic breached this duty. . . . . CoreLogic's breach has caused significant injuries to Ellis which currently include, but are not limited to: greatly increased tax liabilities, increased administrative and employee expense, damage to business and business reputation, and damage to credit. . . .

6

(Doc. 2 ¶¶ 60–62).

In response, CoreLogic argues that it cannot be held liable for negligence because "[a] defendant's mere negligent performance of a contractual duty does not create a tort cause of action; rather, a defendant's breach of a contract may give rise to a tort cause of action only if the defendant has also breached an independent duty created by statute or common law." (Doc. 4-1 at 5) (quoting *Fielbon Dev. Co., LLC v. Colony Bank of Houston Cnty.*, 660 S.E.2d 801, 808 (Ga. Ct. App. 2008)).

Ellis makes three arguments that CoreLogic has breached an independent duty. First, that CoreLogic violated a statutory duty of care, second that it violated a general, common-law duty of care, and third, that it violated its duty as an alleged bailee of Ellis's property. The Court considers each of these in turn.

### A.      Statutory Duty of Care

First, Ellis contends that a duty of care can be found in the Georgia Department of Banking and Finance's ("Department") regulations issued pursuant to its statutory authority under O.C.G.A. § 7-1-61. Specifically, Ellis asserts that a duty of care can be found in Ga. Comp. R. & Regs. 80-11-6-.02, entitled "Mortgage Servicing Standards." However, CoreLogic is correct that this regulation does not apply to commercial loans made to corporate entities.

First, the Mortgage Servicing Standards apply to a "servicer," which is defined as "any person who services a closed-end mortgage loan." Ga. Comp. R.

7

& Regs. 80-11-6-.02(2). Next, the general definition section for the Department's regulation states that "[a]s used in Chapter 80-11-6, the terms that are defined in O.C.G.A. §§ 7-1-4 and 7-1-1000 shall have the identical meaning." Finally, under the cross-referenced definition found in O.C.G.A. § 7-1-1000(21), "'[m]ortgage loan,' means a loan or agreement to extend credit **made to a natural person**, which loan is secured . . . upon any interest in one-to-four family residential property located in Georgia . . . ." (emphasis added). Because Ellis is not a natural person, neither defendant constitutes a "servicer" under the regulation, and consequently, the regulation does not apply.

### B. General Duty of Care

Next, Ellis asserts that CoreLogic owed it a general duty of care to make tax payments promptly and properly on its behalf. CoreLogic raises a number of arguments against this.

First, CoreLogic points to decisions of courts rejecting a general duty of care owed by a mortgage servicer to a borrower. As the Georgia Court of Appeals noted in *Pardue v. Bankers First Federal Savings & Loan Association*, 334 S.E.2d 926, 927 (Ga. Ct. App. 1985)

> [The Georgia] Supreme Court [has] held: "There is no confidential relationship between a bank and its customers merely because the customer had advised with, relied upon, and trusted the bankers in the past. . . .The same is true of the relationship between savings and loan associations and their customers. There

8

> is, moreover, *particularly* no confidential relationship between lender and borrower or mortgagee and mortgagor for they are creditor and debtor with clearly opposite interests.

(citations omitted). Several district and magistrate judges in this Circuit have taken this case law to mean that a borrower cannot bring a claim against a lender or its servicer under a negligence theory. *See Mukendi v. Wells Fargo N.A.*, No. 1:13-CV-1436-RWS, 2014 WL 359947, at *5 (N.D. Ga. Feb. 3, 2014); *Bilal v. Wells Fargo Bank, N.A.*, No. 1:12-CV-3708-TWT, 2014 WL 814228, at *3 (N.D. Ga. Jan. 15, 2014); *Anderson v. Deutsche Bank Nat'l Trust Co.*, No. 1:11-cv-4091-TWT, 2012 WL 3756512, at *9 (N.D. Ga. Aug. 6, 2012), adopted by 2012 WL 3756435 (N.D. Ga. Aug. 27, 2012).

As Ellis points out, however, oftentimes decisions regarding the duty of care a mortgage servicer owes a borrower arise in the context of a plaintiff, often pro se, attempting to challenge a foreclosure. While those cases may be persuasive authority for whether the actions or inactions that the lenders took in those cases did or did not constitute negligence, the Court agrees with Ellis that courts should be wary about citing cases that were not the result of counseled adversary briefing for general, sweeping propositions of law. The Court does not read Georgia law as barring any claim against a mortgage servicer under a negligence theory, but instead reads decisions like *Pardue* quoted above as refinements of the general proposition that "[a] defendant's mere negligent performance of a contractual

9

duty does not create a tort cause of action; rather, a defendant's breach of a contract may give rise to a tort cause of action only if the defendant has also breached an independent duty created by statute or common law." *Fielbon Dev.*, 660 S.E.2d at 808.

The Court thus turns to the specific question of whether failing to disburse funds in escrow promptly and properly could constitute a breach of a duty of care, and if so, whether CoreLogic owed Ellis such a duty of care. The Eleventh Circuit confronted a similar but slightly different issue in *Telfair v. First Union Mortgage Corp.*, 216 F.3d 1333, 1341–42 (11th Cir. 2000). In that case, the Eleventh Circuit considered whether a duty of care arose over a mortgagee's administration of an escrow fund under a trust or agency theory. *Id.* The borrowers alleged that the lender breached that duty by using their escrow funds to pay for forced-placed insurance which was more expensive than their prior insurance policy. *Id.* at 1341. The Eleventh Circuit first rejected the trust theory, writing that "there is no evidence that either type of trust was formed because there is no indication that the [borrowers] and [lender] intended the escrow funds to comprise a trust corpus. Rather, [the lender's] retention of future tax and insurance payments inured to the benefit of both parties in protecting the secured property." *Id.* (notes omitted). Moreover, the court quoted the Georgia Court of Appeals for the proposition that "[t]he majority rule appears to be that funds paid by a mortgagor to an escrow

account to be used by the mortgagee to meet tax and insurance obligations . . . do not constitute trust properties such as would render the mortgagee accountable to the mortgagor for any earnings or profits from the funds." *Id.* at 1341–42 (quoting *Knight v. First Fed. Sav. & Loan Ass'n,* 260 S.E.2d 511, 515 (Ga. Ct. App. 1979)).

"The same reasoning," the Eleventh Circuit wrote, "compels the conclusion that [the lender's] administration of the [lender's] escrow account did not thrust on them the role of agent," because "[u]nder Georgia law, agency results from the manifestation of mutual consent that one person will act on the other's behalf and subject to the other's control" and "[i]n the case of escrow funds held by a mortgagee for payment of tax and insurance payments on behalf of a mortgagor pursuant to a security agreement . . . the mortgagee acts neither for the sole benefit of the mortgagor nor under the mortgagor's control." *Id.* at 1342 (citing *Smith v. Merck,* 57 S.E.2d 326, 332 (Ga. 1950) and *Ga. Farm Bureau Mut. Ins. Co. v. First Fed. Sav. & Loan Ass'n,* 262 S.E.2d 147, 150 (Ga. Ct. App. 1979)).

In another case, relying on *Telfair*, a district court dismissed a claim against a lender for failing to make mortgage life insurance premiums when a borrower was behind on payments, holding that "funds paid by a mortgagor to an escrow account to be used by the mortgagee to meet tax and insurance obligations . . . do not constitute trust properties such as would render the mortgagee accountable to the mortgagor for any earnings or profits from the funds." *Boross v. Liberty Life Ins.*

11

*Co.*, No. 4:10-CV-144, 2011 WL 4102524, at *5–6 (S.D. Ga. Sept. 14, 2011) (quoting *Telfair,* 216 F.3d at 1341–42).

These cases are distinguishable, however, because the duty of care that the borrowers sought to impose in those cases was one of a fiduciary nature,[2] concerning whether a lender must place the borrower's interest ahead of its own in matters like selecting an insurance company, investing escrow funds prudently, or paying credit life insurance premiums when the borrower was delinquent. Indeed, even *Pardue*, routinely cited for the general proposition that a lender owes a borrower no duty of care, concerned whether a mortgagee had a duty to advise borrowers of tax consequences of prepayments, not whether a mortgagee had a duty not to cause borrowers harm by a lack of ordinary care. 334 S.E.2d at 927.

These cases are not dispositive of Ellis's claim, because while a heightened duty of care can arise "[w]hen trust or confidence is reposed in a person," that is not the only way a duty of care arises. O.C.G.A. § 51-1-19; *see also* O.C.G.A. § 23–2–58. As Ellis notes, "[w]here one undertakes an act which he has no duty to perform and another reasonably relies upon that undertaking, the act must generally be performed with ordinary or reasonable care." (Doc. 10 at 11) (quoting *Stelts v. Epperson*, 411 S.E.2d 281, 282 (Ga. Ct. App. 1991)). Moreover, under

---

[2] However, *Telfair* appears to foreclose Ellis's alternative arguments that CoreLogic "assumed the duties of a trustee in an implied trust" or bailment, which is a specific type of trust. (Doc. 10 at 17–18).

12

O.C.G.A. § 51-1-2, "'ordinary diligence' means that care which every prudent man takes of his own property of a similar nature." The Court could not locate any binding authority holding that where a borrower is current on its payments (or at least the escrow portion thereof), a lender has no duty of care to act with ordinary diligence with respect to retained escrow payments. Whether the actions that allegedly led to non-payment of Ellis's tax obligations in this case rose to ordinary negligence is not an issue the Court can determine on a motion to dismiss.

However, even assuming for the present purposes that Ellis has adequately alleged that Shellpoint, as his mortgage servicer, breached a duty of care owed to Ellis, this is not the end of the inquiry because CoreLogic is not Ellis's loan servicer. Instead, CoreLogic contracted with Ellis to provide services under the Tax Services Agreement. (Doc. 14). The Court must therefore consider whether CoreLogic, as opposed to Shellpoint, owed Ellis a duty of care. "The existence of a legal duty is a question of law for the court." *Rasnick v. Krishna Hosp., Inc.*, 713 S.E.2d 835, 837 (Ga. 2011). "In the absence of a legally cognizable duty, there can be no fault or negligence." *Ford Motor Co. v. Reese*, 684 S.E.2d 279, 283 (Ga. Ct. App. 2009); *see also Dickerson v. Colonial Pipeline Co.*, No. 1:21-CV-2098-MHC, 2022 WL 18717801, at *3 (N.D. Ga. June 17, 2022) (analyzing theories of duty of care).

As noted above, Ellis argues that, "[w]here one undertakes an act which he has no duty to perform and another reasonably relies upon that undertaking, the

act must generally be performed with ordinary or reasonable care." (Doc. 10 at 11) (quoting *Stelts v. Epperson*, 411 S.E.2d 281, 282 (Ga. Ct. App. 1991)). For example *Boross*, referenced above, considered whether a lender breached an ordinary duty of care related to escrow payments under an assumption-of-undertaking theory.:

> Boross alleges that by undertaking the obligation of paying Liberty through the escrow arrangement, GMAC had a duty [to] exercise reasonable care in making payments and subsequently failed that duty. . . . . The Georgia Supreme Court has adopted the Second Restatement provision regarding liability to third persons for negligent performance of undertakings:
>
>> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if (a) his failure to exercise reasonable care increases the risk of such harm, or (b) he has undertaken to perform a duty owed by the other to the third person, or (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.
>
> *Huggins v. Aetna Cas. & Sur. Co.*, 245 Ga. 248, 248, 264 S.E.2d 191 (1980) (quoting RESTATEMENT (Second) of Torts § 324A (1965)).

2011 WL 4102524, at *6.

But the Amended Complaint only alleges "CoreLogic assumed a duty to promptly and properly make such property tax payments" by "accepting

14

responsibilities and obligations for handling and overseeing the payment of real property taxes for the Subject Properties." (Doc. 2 ¶ 60). Plaintiff does not allege that CoreLogic undertook an act that it had no duty to perform; nor does it allege reasonable reliance upon any such act or physical harm resulting from it.[3] Moreover, while the Tax Agreement[4] is not dispositive of Ellis's negligence claims where Ellis is not a party to the agreement, the agreement's terms regarding CoreLogic's responsibilities and absence of third-party beneficiaries, combined with Ellis's apparent pre-litigation lack of knowledge of CoreLogic's responsibilities, would seem to cast doubt on the plausibility of any such allegations. Because Ellis has not plausibly alleged a factual basis supporting a duty of care it was owed by CoreLogic, the Court will grant CoreLogic's motion.

## Conclusion

For the above reasons, it is

---

[3] Ellis also argues that O.C.G.A. § 51-1-19 provides a duty of care. (Doc. 10 at 17). That Code section provides that "[w]hen trust or confidence is reposed in a person in consideration of the payment or promise of reward to him, negligence in the person trusted which results in injury to the other person shall give the injured party a right of action." *Id.* Even assuming that this statute applies outside of fiduciary relationships, Ellis alleged no facts to support a plausible conclusion that it reposed trust or confidence in CoreLogic.

[4] The Court may consider the Tax Agreement on a motion to dismiss because Ellis referred to it in the complaint (Doc. 2 ¶¶ 13, 61–64) and it appears to be the basis for one of Ellis's theories of liability. *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997).
15

**ORDERED** that the Clerk is **DIRECTED** to drop Defendant CoreLogic Solutions, LLC (CA) d/b/a CoreLogic ("CoreLogic") as a party and add CoreLogic Tax Services, LLC as a defendant. It is

**FURTHER ORDERED** that the Motion to Dismiss (Doc. 4) is **GRANTED**, and the Amended Complaint (Doc. 2) is **DISMISSED WITH PREJUDICE** as to CoreLogic Tax Services, LLC.

The remaining Parties are **DIRECTED** to proceed according to the Court's Scheduling Order (Doc. 13).

**SO ORDERED** this 17th day of November, 2023.

_____
Victoria Marie Calvert
United States District Judge